1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 4:18-CR-05189-SAB |
| | ) |
| Plaintiff, | ) May 22, 2019 |
| | ) |
| v. | ) Yakima, Washington |
| | ) |
| WASHINGTON STATE DEPARTMENT OF | ) Motion Hearing |
| LABOR AND INDUSTRIES, STATE OF | ) |
| WASHINGTON, JAY INSLEE, in his | ) |
| official capacity as Governor | ) Pages 1 to 60 |
| of the State of Washington, | ) |
| JOEL SACKS, in his official | ) |
| capacity as Director of | ) |
| Washington State Department of | ) |
| Labor and Industries, | ) |
| | ) |
| Defendants. | ) |

BEFORE THE HONORABLE STANLEY A. BASTIAN
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:            Christopher R. Healy
                             Christopher.Healy@usdoj.gov
                             US Department of Justice
                             1100 L. Street NW
                             Washington, DC 20005
                             202-514-8095


For the Defendants:          Anastasia Sandstrom
                             Anas@atg.wa.gov
                             WA Attorney General's Office -
                             Seattle
                             800 Fifth Avenue
                             Suite 2000
                             Seattle, WA 98104
                             206-464-6993

KIMBERLY J. ALLEN, RMR, CRR, RPR, CCR
OFFICIAL COURT REPORTER

2

Official Court Reporter:          Kimberly J. Allen, CCR #2758
                                  United States District Courthouse
                                  P.O. Box 685
                                  Richland, Washington 99352
                                  (509) 943-8175

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.

3

**INDEX**

**Proceedings:**                                                    **Page**

          Argument by Mr. Healy                            6
          Argument by Ms. Sandstrom                       31
          Rebuttal Argument by Mr. Healy                  44
          Rebuttal Argument by Ms. Sandstrom              53

**WITNESS INDEX**

**Plaintiff Witness:**                                              **Page**


   None


***** 


**Defense Witnesses:**                                             **Page**


   None


**EXHIBITS ADMITTED**

| Plaintiff Number | Description | Page |
| --- | --- | --- |
| | None | |

| Defense Number | Description | Page |
| --- | --- | --- |
| | None | |

**GENERAL INDEX**

**Page**

Reporter's Certificate.............................60

(May 22, 2019; 1:38 p.m.)

THE COURTROOM DEPUTY:  Please rise.

(Call to Order of the Court.)

THE COURT:  All right.  Good afternoon.  Please be seated.

THE COURTROOM DEPUTY:  The matter now before the Court is the *United States of America v. Washington State Department of Labor and -- Labor & Industries*, Case No. 4:18-CV-05189-SAB. This is the time set for a motion hearing.

Counsel, please state your presence for the Court and record.

MR. HEALY:  Christopher Healy for the United States.

THE COURT:  All right.  Good afternoon.

MS. SANDSTROM:  Anastasia Sandstrom for the State of Washington.

THE COURT:  All right.  Good afternoon to both of you.

Can you introduce who you have at the table with you, too, so -- at this time?

MR. HEALY:  Sure.  I'm here with my colleague Jacqueline Coleman-Snead.

THE COURT:  All right.  Hello.

MS. SANDSTROM:  I'm here with my colleague Paul Weideman.

THE COURT:  All right.  Hello.

All right.  We have cross motions.  I believe that the United States filed its motion first, and I think the United

States is actually challenging the new law passed by the state, so it makes sense to me that the United States would proceed first.

Any objection to that, Ms. Sandstrom?

MS. SANDSTROM:  No objection, Your Honor.

THE COURT:  All right.  Go ahead.

Mr. Healy, give me a moment just before you start your remarks.

MR. HEALY:  Sure.  Take your time.

(Pause in proceedings.)

THE COURT:  All right.  I've got another matter at 3 o'clock.  I'm not suggesting that we need to spend the next hour and a half on this, but I'm not particularly concerned about the time.

How much time do you think you need to make your --

MR. HEALY:  I'm prepared to stay within the 15 minutes-ish.

THE COURT:  Okay.  Well, then I'm not going to bother keeping time.  I'll let you just --

MR. HEALY:  I may go a little bit -- I may go a little bit over.

THE COURT:  That's fine.  I'm not concerned about the time.

MR. HEALY:  Sure.

Your Honor, Washington has passed a workers' compensation

*USA v. Washington State Dept. Of Labor and Industries/4:18-CV-05189-SAB 7*
*Motion Hearing/May 22, 2019*

law that violates the intergovernmental immunity doctrine of the Supremacy Clause because it discriminates against the federal government and its contractors, and because it directly regulates the United States.

HB1723 creates a prima facia presumption that a contract worker at the Hanford nuclear facility who works a single 8-hour shift becomes entitled to workers' compensation benefits if that worker comes down with one of a long list of illnesses, including workers -- including respiratory disease and neurological disease, which are terms that are not defined in the law.

The law applies to a single federal facility on its face, and would require the federal government to cover costly health care costs, pension payments, and other benefits for workers whose illnesses are unrelated to their work at the Hanford site.

In so doing, the law places burdens on the federal government and its contractors that are faced by no other entity in the state and directly regulates the federal government by interfering with its workers' compensation operations.

I'd like to begin by addressing what the Washington -- what Washington appears to be -- appears to believe is the linchpin of its case; that is, the waiver provision of 40 U.S.C. 3172.

Prior to the enactment of this provision in the 1930s, states were disallowed from regulating workers' compensation on

federal land or federal projects at all.  The 3172 waiver allowed states to apply their workers' compensation laws to federal contractors to the same extent -- so long as -- as those laws apply, quote, to the same -- in the same way and to the same extent as if the premises were under the exclusive jurisdiction of the state.

This provision does not waive immunity over the enactment of a discriminatory law like HB1723 at all, let alone clearly and unambiguous, as the Supreme Court -- as the Supreme Court held in the *Goodyear Atomic* case.  The plain language of this provision requires that the state not only regulate in the same way that they regulate elsewhere under their exclusive jurisdiction -- that is, in accordance with state and federal law -- but also to the same extent that the law applies elsewhere.  That is, not to some extreme degree on federal land that it could not apply its law elsewhere.

HB1723 does not apply to the same extent as if Hanford were under the exclusive jurisdiction of the state because the law applies specific provisions for federal contractors at Hanford that are not applied to any other entity in the state.

The state could not apply --

THE COURT:  There is no other entity in the state that has workers working on projects similar to the Hanford cleanup.

MR. HEALY:  That's true, Your Honor, to an extent, but the -- there are workers that do all sorts of work at Hanford.

There are -- as we mentioned in our briefing, there are office workers at Hanford; there are workers who work in hazardous positions, and work in nonhazardous positions.  And so Washington makes the point that they believe that Hanford is a class of one.  And it may be that Hanford's land is a class of one, but it's -- the -- the law itself does not operate on Hanford's land.  It operates with respect to the workers at the site and the employers at the site.  And the workers and employers at the site are not a class of one.  And I think that's an important distinction.

THE COURT:  No, but are there other workers that are doing the same type of work that this law does not apply to?

MR. HEALY:  Are there other workers doing the same type of work that this law does not apply to?

There are -- for example, an office worker at the covered portion of the Hanford site, even if they are, you know, a typist, who is spending hours in front of a computer, is doing the same kind of work that those similar positions would -- would be all over the state.

So, yes, is the answer; I think there are similarly situated workers elsewhere in the state.

THE COURT:  Are you suggesting this -- this new law that the state passed applies to the office workers working for the third-party contractors employed by the U.S. Government at the Hanford site?

MR. HEALY:  It applies to federal contractors, not those employed by the U.S. Government, but those -- but it applies to federal contractors on the covered portions of the site.

THE COURT:  That's what I meant.

MR. HEALY:  Yes, it does.

THE COURT:  And so it would apply to the office workers that are working for those third-party contractors.

MR. HEALY:  That's correct.

THE COURT:  But are those office workers exposed to the same hazards as an office worker in this courthouse?

MR. HEALY:  I -- I think -- it is our position that those workers are exposed to the same hazards.  But I think it's important to understand that the discrimination is not only with respect to, you know, an office worker at Hanford that may potentially be exposed to something that an office worker here in this courthouse would not be.  The discrimination is much more blatant than that, if you actually take a look at the specific examples in which it appears.

For example, there are numerous state contractors -- state employees who work for the state Department of Health, for example, state Department of Ecology, who conduct inspections at the Hanford site.  And those individuals are frequently accompanied by federal contractor employees during those inspections.

During any of these particular inspections, if an

inspector spends eight hours at this facility, walking through the site conducting inspections, the state employee would not receive the presumption, while the federal contractor employee would receive the presumption.

So this discrimination is very blatant, and to the point where there just cannot be any -- any rational reason, let alone a significant justification, as the Supreme Court would require, for the difference in treatment that this law actually enacts.

I'd like to turn back for a minute to the -- to the -- Washington's argument with respect to the waiver provision, because they do appear to believe this is the crux of their case. They point to this "as if" phrase to say, look, this language allows the state to regulate federal contractors on federal land just as if it were land elsewhere in the state.

To be clear, Your Honor, the United States does not disagree with this interpretation of the statute. Congress allowed the state to regulate on federal land just as it is allowed to regulate elsewhere in the state.

What Washington appears to misapprehend, however, which I think is a very important point, is that Washington's power to regulate anywhere under its exclusive jurisdiction in the state does not include the power to discriminate against federal contractors or directly regulate the federal government.

In response to this point, in its reply on -- in Footnote 2 on Page 7, the State's only response to this point is

that it, quote, seems unlikely that federal contractors would be working on state or private land.

This does happen, Your Honor.  In fact, the *Boeing* case was exactly such a situation.  In that situation, the federal contractors were doing federal cleanup work on private property that was owned by the Boeing Company.  And the Ninth Circuit in that case found that a state law that applied heightened cleanup standards with respect to that property and abutting federal property violated the Supremacy Clause, notwithstanding the fact that the site was uniquely contaminated.

The obvious major problem with Washington's interpretation of the 3172 waiver is that Washington's interpretation of its regulatory power here is essentially limitless.  Washington's position, as I understand it, is that it can regulate workers' compensation for federal contractors on federal land to the full extent of its power over private entities.  Washington provides no reason why Congress would do such a thing, Your Honor.  Indeed, their interpretation would cut directly against the heart of the intergovernmental immunity doctrine from as early as *McCulloch v. Maryland*, which established it.

THE COURT:  Let me ask, if the federal government weren't involved and this was just state land, and the same third-party contractors were out there, and the same risks were involved that the state has identified, would the state have the legal

authority to adopt this law and create this presumption for those workers?

MR. HEALY:  No, Your Honor --

THE COURT:  Why not?

MR. HEALY:  -- because they would still be federal contractors.  An intergovernmental --

THE COURT:  No, I'm saying take the federal contractor out of it.

MR. HEALY:  If -- oh.  If they were not federal contractors, and they were simply private entities on state or private land, yes.

THE COURT:  Okay.

MR. HEALY:  They would have that power.  And, in fact, they've pointed to examples of where they've created presumptions that apply across the board on state and private land, as well as federal land; for firefighters, for example.  A firefighter at Hanford isn't treated any differently than a firefighter on state land.

THE COURT:  Does the fact that the state passed this law, and it became effective -- and, I'm sorry, I don't have the dates at hand, but it became effective, and then a few weeks later the federal government signed the memorandum of understanding where it accepted the responsibilities of being the employer, does that play into the Government's analysis at all?

MR. HEALY:  No, it doesn't --

THE COURT:  In other words, the Government didn't have to be there as the employer, did it?

MR. HEALY:  That's -- that's true.  The -- the Government has been in the practice of signing these MOUs for several -- for at least a decade, if not more.  They've signed many iterations of these.  And some substantive terms of them have not changed, although the names of the contractors have changed.  And so this is -- this is how this practice has worked for -- for a long period of time.

But I think the -- the more direct answer to your question is the fact that a state agency or, rather, a federal agency may not waive intergovernmental immunity on its own.  And that is clear in the case law, that only Congress can waive intergovernmental immunity, not an agency; that Congress can only do it clearly and unambiguously.

And in the *Hancock* case, which is a Supreme Court case, the Court found that a state implementation plan under the Clean Air Act that had been approved by the EPA nonetheless waived -- nonetheless violated intergovernmental immunity because of the fact that Congress had not actually provided --

THE COURT:  So what you're saying is -- is that -- I think it's the Department of Energy, then that agency signing the MOU does not operate as a waiver because that can only happen --

MR. HEALY:  That can only happen through Congress.  And I think even if -- even if that weren't the law, I think if you look at the MOU, the MOU doesn't actually waive immunity over -- over this particular kind of regulation because it only applies with respect to applicable laws of the state of Washington, of which we would not admit that this is one, and also would only apply with respect to claims that are related to the Hanford site.  And those are specific provisions that are within the MOU.  And this law would require that the DOE pay -- pay out claims for -- for -- that are not related to the Hanford site.

So I don't think that DOE has agreed to this, regardless of the fact that they've signed the MOU.  But, notwithstanding, I think the argument is simply incorrect because of the fact that Congress is the one that needs to actually perform the waiver clearly and unambiguously.

THE COURT:  Okay.  Thank you.

MR. HEALY:  I think it's important to understand that the intergovernmental -- the purpose of the intergovernmental immunity doctrine here is that it's a political check.  It would require that the -- it allow -- it ensures that the federal government, which has no voice in state legislatures, may not be burdened by regulations that are created in a forum in which the federal government does not have a direct voice.

At the very least, the 3172 provision is ambiguous, and cannot be read to presume such a result, given the clear

statement rule for intergovernmental immunity waivers.

THE COURT:  Well, I guess I'm still hung up on that "same way and to the same extent"/"as if" language.  The Government has -- or the federal government has focused the Court's attention on "same way, same extent"; the State kind of focuses the Court's attention on the "as if" phrase.

But looking at it in its entirety, it says, the way I read it, is the federal government waives immunity for purposes of -- these are my words, not the statutory words --

MR. HEALY:  Sure.

THE COURT:  -- for purposes of enforcement of L&I as long as the state is -- is enforcing L&I against the federal government or its contractors in the same way and to the same extent as if these premises were being operated by the state.

So does the federal government take the position that the state could not have passed this law and enforced it against its own workers if the state were managing the Hanford project?

MR. HEALY:  I don't think that this -- I don't think the waiver provision at all affects what the state could do with respect to the state's workers.

THE COURT:  So if the state could do this against state workers or other employers that were operating the Hanford site, assuming the federal government wasn't out there, why can't they do it to the federal government or its contractors, pursuant to 3172?  I mean, I see 3172 to not be as ambiguous as both the

federal government and the State are trying to argue to the Court it is.  It doesn't seem ambiguous to me.

MR. HEALY:  So I think if you look at all of the statutes, the statutes that were cited on our side and the statutes that were cited by the State, that phrase, or some version of that phrase, appears throughout these statutes. Every one -- every time there's an intergovernmental immunity waiver, there is one of these "in the same manner, in the same extent," or "in the same way and to the same extent," as -- and sometimes it says at the end, you know, "as other land may be taxed," or "as if under the exclusive premises jurisdiction of the state."

And -- and -- and the State wants to focus Your Honor's attention on the differences between the tail end of that statute.  But I think what's important to understand is that the purpose of that "same manner and same extent" is -- is that in all of these statutes, the clear intent is to treat the Government in an evenhanded way.  You can -- you can apply your regulations either to the federal government or to federal contractors, whatever the situation is, but you have to do it in a way that doesn't discriminate against the federal government or its contractors.  I think that it's clear that that's what -- each -- that Congress in each of these instances was doing, and I don't think that there's any legitimate rationale that can be devised to understand Congress' intent in this statute to be

wildly different than Congress' extent [sic] in RCRA or in CERCLA or in, you know, the various other provisions that have been pointed out by the parties.

I'd like to spend a minute talking in a little bit more detail about the discrimination aspect.

THE COURT:  You're fine.  You're fine.

MR. HEALY:  The law discriminates on its face.  It applies to -- only to, quote, United States Department of Energy Hanford site workers, which are defined to include any workers who work, quote, directly or indirectly for the United States at the Hanford site.  The law defines "the Hanford site" to include the federally owned and operated areas of the site and exclude nonfederal areas.

The question for this Court is whether the law treats someone else better than it treats the federal government or those with whom it deals.  Courts thus uphold laws that treat the federal government, or its contractors, the same or better than nonfederal parties, but strike down laws that treat the federal government worse than those parties.

Here it is clear, as I mentioned previously with the example of the -- with the state inspectors, that these treat similarly situated entities -- similarly situated individuals at Hanford dissimilarly.

In addition, there are numerous other ways you can -- you can slice this to understand how this law is discriminatory.  A

Hanford worker who worked one 8-hour shift at the Hanford site, let's say, back in the 1970s, it's been many decades since then, and now that contractor has -- has fallen ill with Alzheimer's disease. And let's say that that worker has a family history of Alzheimer's; everyone in their families had Alzheimer's, both parents had Alzheimer's. It would be the responsibility of the federal government to disprove a presumption that the Alzheimer's was as a result of that one 8-hour shift decades ago, which is basically an impossible task. It's never going to be possible for the Government to disprove, by clear and convincing evidence, that there was a causal connection between --

THE COURT: Well, I think that's what the state was trying to address, is that it's been fairly difficult for workers to prove, based on the bad recordkeeping going on at the Hanford site by both the federal government and the third-party contractors, that it's been next to impossible for employees exposed to this unreasonable risk to prove the connection that their cancer or their life-threatening condition was caused by this constant exposure.

So the Court's not terribly sympathetic to the problems the Government might meet trying to disprove it. I mean, I don't see that as a very compelling argument.

MR. HEALY: I understand that that --

THE COURT: I'm still focused on if the state could do

this to state workers or other workers not involved with the federal government, then why can't they do that to the federal government and its third-party contractors based on, because they're treating people in the same way and to the same extent as if the premises were under the exclusive jurisdiction of the state.  And the federal government has, I think, just stipulated that the state could enforce this rule against itself or against state employers.

So why can't it enforce it against the federal government?

MR. HEALY:  I understand the question.  I think that hypothetical fundamentally changes the nature of this statute. I think a statute that applied to this --

THE COURT:  I'm just -- I think you're -- I think both parties, I'm going to fault both of you for trying to make a fairly simple statute appear to the Court to be ambiguous for the purposes that you're trying to argue.  The statute is fairly clear.

Why don't you -- tell me why what the state has done has violated the statute.  Why isn't this waiver -- why shouldn't the Court read this waiver of immunity as broadly as I'm clearly indicating to you that I'm inclined to do?

MR. HEALY:  I understand, Your Honor's point.  I respectfully disagree with the fact that this -- that this is directly analogous to a situation in which the state is -- is --

is applying a law with respect to state workers.  The intergovernmental immunity doctrine does not apply at all with respect to state workers.  It applies only with respect to federal contractors.

THE COURT:  I know, and the federal government, by act of Congress, has said that you can treat us just as if you would treat someone else.  And you've said they could treat someone else this way, and the federal Congress has said you can treat us just the way as you would treat someone else.

So why can't they treat you that way now?

MR. HEALY:  I don't think that the statute says that the --

THE COURT:  Why doesn't it say that?  I'm reading --

MR. HEALY:  What the statute says, Your Honor --

THE COURT:  Okay.

MR. HEALY:  -- is -- with respect, is that they can apply those laws in the same way and to the same extent as if the premises were under the exclusive jurisdiction of the state.

THE COURT:  Right.

MR. HEALY:  It doesn't say anything about transforming the nature of the statute to apply to some other entity that the statute does not otherwise apply to.  The statute applies to federal contractors.

So I think the question should be:  Could they apply a state law to federal contractors elsewhere in the state?  And

the answer is that they couldn't.

THE COURT:  I don't think the statute says that, but continue with your argument.

MR. HEALY:  Okay.

THE COURT:  Are you arguing that this statute is basically -- can't be changed?  In other words, this is an enforcement statute, but it doesn't authorize the state to change the law?

MR. HEALY:  I'm sorry --

THE COURT:  In other words --

MR. HEALY:  -- I don't understand the question.

THE COURT:  -- you just waived immunity based on the way the state law was when this statute was passed in the 1930s, but the states can't change their L&I laws and enforce them.

MR. HEALY:  I'm not sure I follow the question.

THE COURT:  Okay.  When was 3172 adopted?

MR. HEALY:  In the 1930s.  1936 --

THE COURT:  Okay.

MR. HEALY:  -- I think.

THE COURT:  So is the Government arguing to me that this statute only authorizes the government to enforce the laws as they currently existed in 1930, or does this go beyond that and say the state can change its law and still apply them to the federal government?

MR. HEALY:  Oh, absolutely the state can change its

law --

THE COURT:  Okay.

MR. HEALY:  -- as long as it does so in an evenhanded manner.  It has to do so in the same way and the same extent that it would do -- it would do as if it was elsewhere in the state.  So the state has multiple times amended their workers' compensation law without issue, and I think that --

THE COURT:  Well, and I agree with you on that.  And I think -- and it could be my fault, and probably is, with my question, but this is what I'm focused on:  I thought you said that the federal government stipulates that the state of Washington could pass a law that changes this burden of proof, as they've done here, and apply it to this Hanford site on the assumption that the state -- and the federal government wasn't even involved, and just for purposes of my hypothetical, the federal government is not even there, it's purely a state project, and they've hired third-party contractors to come out and do this cleanup work.

I thought you said the federal government agrees the state could pass this law.

MR. HEALY:  I do agree that the state could pass that law.  But I don't think that's apposite to this case.  And the reason --

THE COURT:  Well, I think, then, the statute says the state can apply that law to the federal government in the same

*USA v. Washington State Dept. Of Labor and Industries/4:18-CV-05189-SAB* 24
*Motion Hearing/May 22, 2019*

way and to the same extent as if the premises were under the jurisdiction of the state.  That's what I'm hung up on, and I'm not understanding your argument that it doesn't say what I -- what I read it to say.

MR. HEALY:  So -- so I think, actually, perhaps the misunderstanding is not actually with the -- the waiver statute. It may be with HB1723 itself.

If Your Honor takes a look at the statute --

THE COURT:  Okay.

MR. HEALY:  -- and take a look at what HB1723 --

THE COURT:  Let's take a look at the words.

Is that quoted in your brief, so I can take a look at it?

MR. HEALY:  The words of the statute?

THE COURT:  Yeah.

MR. HEALY:  Sure.  It is.  It is, if you'd just give me a moment.

THE COURT:  I'm sure it is.  I just don't know the page.

MR. HEALY:  It's attached to my declaration, along with the -- along with -- my declaration, along with our opening motion.

THE COURT:  Okay.

MR. HEALY:  Declaration of Christopher Healy.  I think it's Exhibit A --

THE COURT:  Yeah, I didn't mean to interrupt you --

MR. HEALY:  No, that's all right.

*USA v. Washington State Dept. Of Labor and Industries/4:18-CV-05189-SAB* 25
*Motion Hearing/May 22, 2019*

THE COURT:  -- but if you just give me a page number, it makes it easier.

MR. HEALY:  Um, I -- it's -- it would be Exhibit 20-1, Declaration of Christopher Healy --

THE COURT:  Okay.  Go ahead.  I'll find it while you --

MR. HEALY:  -- with the statute -- I just need a moment to find the statute as well.

So the statute itself applies to the United States Department of Energy Hanford site workers, and it defines those as individuals who are performing work either directly or indirectly for the United States.

And the law itself does that.  There's nothing -- in this hypothetical that Your Honor has described, you would sort of have to change the nature of the law to -- to say, you know, this is a state agency applying to -- to state facilities.  And so --

THE COURT:  I think I understand.  Just to make sure --

MR. HEALY:  Yeah.

THE COURT:  -- because I've kind of been focused on this, so looking at the statute, you say that this isn't "in the same way, in the same manner/as if" because of the wording of the statute itself, which makes specific reference to the United States or its third-party contractors.

MR. HEALY:  Exactly.

THE COURT:  So is the Government taking the position the

statute would be perfectly acceptable if the statute was worded differently?

MR. HEALY:  I think --

THE COURT:  Instead of saying those workers at the Hanford site "working directly or indirectly for the United States," perhaps the State should have said "either directly or indirectly at the Hanford site."

MR. HEALY:  I don't think it could have said "directly or indirectly at the Hanford site" because of the nature of the Hanford site as owned by the federal government.  But I think if this were a law, some hypothetical law that said, you know, the state owns this facility and -- and any state of Washington employees who work at this facility should receive this presumption, I don't think there would be a problem with that statute.

But this statute doesn't do that.  This statute affects specifically -- I don't think it's just wording.  I think it's what it is substantively doing, which is affecting the United States Department of Energy Hanford site workers, those who work directly or indirectly for the United States.

THE COURT:  But it seems to me you're arguing that the reason this fails for your discrimination test is because it specifically uses the words "for the United States."

MR. HEALY:  So I think that that's -- that's correct in that what it is doing is it is singling out federal contractors.

I think a differently worded statute that nonetheless singled out federal contractors would not survive intergovernmental immunity either.

THE COURT:  Okay.

MR. HEALY:  It's the function of what it's doing, is my point.

I think Your Honor understands the -- my point with respect to discrimination, but I'd like to talk about the State's argument with respect to their invocation of the rational basis test.  They say if the state had a rational basis, that then -- then this Court should uphold the law.

They seem to believe that this Court should be importing Equal Protection Clause doctrine into intergovernmental immunity analysis, even though that's exactly what the Supreme Court in *Davis* asked -- required courts not to do.  But a state law -- that -- that -- the Supreme Court in *Davis* required that a state law that treats federal entities differently have a reason that is directly related to or justified by a significant difference.

This law discriminates in a way that is not linked to the contaminated nature of the site.  In the ways I've described, it treats similarly situated entities differently.

The State also contends that -- that Your Honor should balance the interests between the state and -- and the federal government.  If you look at the *Davis* case, that's exactly what the Court did not do in that case.  It found that a state's

interest in passing an allegedly discriminatory tax -- as Your Honor mentioned before, the state had -- has described its reasons for passing this law, and the Supreme Court in that case found that an allegedly discriminatory tax, no matter how substantial, is -- the state's interest in passing that tax is, quote, simply irrelevant to the inquiry.

So the state may have had very good reasons to pass this law, Your Honor, but that inquiry is not something that should be taken into account.

THE COURT:  So the U.S. Government is taking the position the rational basis test doesn't really apply to the analysis.

MR. HEALY:  The rational basis test does not apply to the analysis; and, secondly, that a balancing of the interests is not the correct analysis either.

THE COURT:  Balancing.  Okay.

Let me go back to something else you said, and I was going to get to this towards the end of your remarks.  Does this motion resolve the case one way or the other, in the opinion of you and your client?

MR. HEALY:  Yes, Your Honor.

THE COURT:  You've taken the position that the state act is treating similar workers differently.  And I know the State, in its brief, has said no, they're not.

Is that a material issue of fact that needs to be resolved?

MR. HEALY:  I don't think -- I don't think it is, Your Honor.  And there -- I understand -- I understand the point, and there certainly is difference in opinion about the potential effects of this law, but I don't think that it's necessary to do fact-finding in this case, and I think the State agrees, because the question is simply one of law.  If you look at the statute on its face, it discriminates in the ways that I've described, and I think that that would occur regardless of the contaminated nature of the site, which -- which, in addition, has been, under binding Ninth Circuit precedent, the -- the Court in *Boeing* said that this Court shouldn't actually take a look at the contaminated nature of the site.

THE COURT:  I didn't mean to suggest I wanted to do fact-finding.  I just wanted --

MR. HEALY:  Yes --

THE COURT:  -- to know your position.

MR. HEALY:  -- I think everyone is in agreement --

THE COURT:  Okay.

MR. HEALY:  -- if you are, that we would not do fact-finding here.

THE COURT:  Okay.

MR. HEALY:  Finally, I'd like to briefly describe the direct regulation argument.  The law also directly regulates the federal government by requiring it to rebut claims it would otherwise not be required to rebut, by requiring it to pay out

claims it would otherwise not be required to pay.

The Department of Labor and Industries itself estimated that, when this bill was being considered, that thousands of new claims would likely be filed in the next several years, and legislative testimony shows that the legislators intended DOE to foot the bill.  It is easy to spend someone else's money, Your Honor, and that's what this law does.

There are numerous ways that the regulation would affect DOE's workers' compensation operations.  First and foremost, it requires a higher burden of proof for rebuttal for many ailments that would not have been compensable at all prior to HB1723.  It would require obtaining outdated, archived, or unavailable medical records to do so, since it eliminates the statute of limitations for claims, and would require DOE to maintain these records indefinitely.

It also eliminates the last injurious exposure rule such that DOE must rebut claims for occupational diseases that may have been caused by more recent exposures unrelated to Hanford.

And as I mentioned before, these -- rebutting this presumption may be, in many cases, impossible to do.

Washington argues that this cannot amount to direct regulation because DOE voluntarily agreed to act as employer of record under Washington law for the majority of its Hanford workforce.  We've discussed this.  Only a clear and unambiguous waiver from Congress may waive.  I would refer Your Honor to the

Hanford -- to the *Hancock* case, as I mentioned.

Finally, on reply, Washington argues that it would require interference with cleanup operations for there to be direct regulation of the federal government.

To be clear, if the law remains in effect, there may be some impact on cleanup operations that we don't yet know, but they provide no reason why DOE's workers' compensation operations are not also governmental operations. They've cited no case law for the proposition that DOE's MOU with the state renders all action done pursuant to that agreement nongovernmental. DOE's workers' compensation operations are operations of the federal government. The MOU does not place them outside the boundaries of the constitution's direct -- restriction on direct regulation.

For the foregoing reasons, Your Honor, the Court [sic] respectfully requests that you enter judgment in favor of the United States and deny Washington's cross motion.

Thank you.

THE COURT:  Thank you.

I'll give you a chance to make a brief reply as well. Both parties can do that, since there are cross motions.

Ms. Sandstrom, you can get set up. Just give me one moment.

(Pause in proceedings.)

THE COURT:  All right.

MS. SANDSTROM:  Good afternoon.  May it please the Court.  I'm Anastasia Sandstrom, assistant attorney general, representing the State of Washington.

Hanford has hazards not present anywhere else in Washington state, and Washington has properly taken action to protect its workers.

This Court should grant summary judgment for three reasons.  First, Section 3172 is a waiver of sovereign immunity -- or intergovernmental immunity.  Second, the inquiry under this statute is, indeed, as the Court, and I believe counsel would agree, that you have to look to see whether it could be regulated on state land under the state's jurisdiction.

THE COURT:  I'm listening.  I'm just going to --

MS. SANDSTROM:  Oh, okay.

And then, finally, number three, Department of Energy agreed to the intergovernmental -- or agreed to the MOU five days after the bill was passed, agreeing to its terms.

So the facts here are important because the federal government has conceded that Hanford is unprecedented and has a cleanup operation that is unprecedented in scale and complexity.  They've conceded that there's -- there's radioactive hazards that are unique to Hanford and nowhere else.  They've not disputed that Hanford presents a unique set of medical challenges, based on the fact that there is a lack of monitoring over workers to see what exposures they had, which directly

affects their ability to know whether they have conditions, and also the hazards they are placed.  They don't refute that.

And under 3172, which does govern here, it's a waiver of intergovernmental immunity.  And under the statute, it has to be to the same extent and same way as if it were under the exclusive jurisdiction of the state.  So the inquiry is take the federal government out of it.  Take the federal government out of the equation, and from that, then determine if it is acceptable under state law.  And that's where the rational basis test comes in.  But you take the federal government out of it, see if the law is acceptable under state law.

And as I understand their stipulation, they do agree that if we didn't have the federal government involved at all, then the state could have a law that addresses a specific hazard on land.  But what they argue is, well, this -- this involves federal contractors, so therefore that language doesn't apply.

But it's a waiver of intergovernmental immunities for federal contractors.  The Congress specifically anticipated there would be federal contractor workers covered.  I mean, you look to the legislative history, and it was federal contractors working, I think, on the Golden Gate Bridge, and, you know, that was a project that was a federal project.  And so take the federal government out of it; under this law, those workers are covered.  So --

THE COURT:  But I think I'm -- Mr. Healy pointed out

that -- I was not understanding his argument very well, and then he clarified that the reason this isn't -- or the reason this doesn't fit into the "same way, same extent/as if" language is because of the way the state worded its state statute.  It specifically references to workers of contractors, or some contractors employed by the United States.

I mean, the state could have avoided, it seems to me -- Mr. Healy may not agree -- but it seems to me that the state could have avoided this, had they just drafted this a little more carefully and just said:  This statute applies to all workers who are working under these conditions out at the Hanford site.

MS. SANDSTROM:  I don't think that that's the pivot point of -- of the case, because the statute contemplates that if you could write a statute under its same terms, could you -- could it be acceptable.  So you take the federal government out of it, and the fact -- you could write a law about the post office, which they've had in the cases -- accidents at the post office, and the statute would allow, because, under their theory, the state could take action for hazards on its land, but can't take action for hazards on federal land?

That's not what Congress intended.  Congress specifically didn't intend that, and that's in *Capitola* case, *Travelers Insurance* case.  It was to give workers who are working on federal land with hazards to have the same kind of protections

they could have if that land was the state's.

And so there is a waiver of intergovernmental immunity with that language, and it doesn't matter that -- the -- the federal government can be named because they're -- it's as if they were the state land, and they can be regulated.

THE COURT:  But then I think Mr. Healy's argument goes on that discrimination can be demonstrated by the fact that -- he made reference to one example, and perhaps there's others, but the one that I put in my notes is state inspectors who go out and inspect on a regular basis and meet the other definitions -- spending 8 hours at the site and this sort of thing -- the law doesn't apply to them, so if they have one of these cancerous or life-threatening conditions 15 years down the line, the presumption would be they would have to show the causal connection rather than the employer showing the lack of a causal connection.

So why did the state make that distinction?  And the fact that the state did make that distinction, doesn't that show discrimination against the federal government?

MS. SANDSTROM:  Well -- well, first of all, we have to consider whether it's permissible to have differential treatment to the federal government.  And the *Lewis* case says, which the United States Government has not mentioned once in its briefing and nor in its argument, but in that case there was -- the federal government was treated differently than state and

county, and the Court said that that was fine because there was a waiver of intergovernmental immunity.  So there can be differential treatment based on *Lewis*.  And *Goodyear* supports this because it said there can be direct regulation.

So the consequence of a waiver of intergovernmental immunity is that the two-part test that he's relying on *Davis* and the *Boeing* case, none of that applies because in those cases there was no waiver of intergovernmental immunity expressly by Congress.  Congress can decide whether -- Congress can decide whether the federal government should be regulated, and they have in *Goodyear*, direct regulation there; in *Lewis*, you can have differential treatment.

But I would say -- so then we take it back, and could you treat Department of Health differently under the rational basis test under Washington law, which does apply because intergovernmental immunity has been waived; that *Davis* doesn't apply.  Under rational basis, the state can very well assume that the Department of Health and Department of Ecology workers weren't exposed to enough time or they weren't the ones that were getting ill or it was the federal contractor employees that were really the problem.  And if you look at their track record, I mean, we just had an exposure last week that they knew about in March and let the workers be exposed to it.

So the federal contractors are the ones that are regulated by the statute, and they're the ones that are the

problem.  And it's well accepted under rational basis that you can solve one problem at a time.  Even if we assumed this hypothetical Department of Health employee got sick 20 years from now, the Department -- the state can choose, under the step-by-step approach that is permissible, to solve one problem at a time and address that later.

But I think, fundamentally, under rational basis, you can have differential treatment under there if it's based in something that serves a legitimate government interest.  And here we do have hazards, and the Government's interest to protect workers.  Counsel has provided in his briefing and just in -- or the United States has provided in the briefing and in his remarks that there's all these difficulties with medical records and different things and proving these cases and it's really hard.

Well, right now they want the workers to have the really hard proof.  And the state has said no, federal contractors are in the position of power.  They are the ones that should maintain the records; they are the ones that should do adequate monitoring to protect workers; they're the ones that if they know there's going to be the potential for release of strontium 90, that they take action on it, or other hazardous chemicals and radioactive isotopes; they're the ones that should be responsible for that.

So I think the fundamental analysis is to first start off

with:  What is 3172?  What -- 3172 is a statute that waives intergovernmental immunity.  So the two-part test does not apply under the *Goodyear* case and the *Lewis* case, and -- and the references to *Boeing* and *Davis* just simply don't apply.

And it is a -- I would say that it is unambiguous that if it -- you take the federal government out of the equation is the analysis, because it has to be as if it was in the exclusive jurisdiction of the state, and that is unambiguous.

So here, if you take the federal government out of the equation, they don't even dispute that it wouldn't be -- it would be acceptable if you did that.  What they're creating is a false sense that if you have federal contractors involved, the statute doesn't apply.

Well, that can't be the rule because this is a statute that waives intergovernmental immunity with respect to federal contractors.  Of course there are federal contractors involved. That's what the statute is all about.  That's going to be permissible to regulate them and give them the same rights that citizens would have if they weren't under the exclusive control. And Washington has taken steps in its own jurisdiction to address problems with firefighters.  It has -- its taxation structure for industrial insurance has been approved by the Supreme Court, and it targets special industries.  It has a hazard-based approach which it then can apply in the situation of the federal government.

So there -- and there is a political check here.  I think that was something that was mentioned in the *Lewis* case.  This law is about federal contractors.  Federal contractors are citizens of the state of Washington.  They can lobby the legislature.  They have a vote.  In fact, when you look at the legislative history, there was testimony from business interests opposing the statute.  So they participated in the system and they had a vote and that -- there is a political check because this isn't a statute -- we don't regulate the federal government.

Now, they say, well, you're directly regulating us because we undertook the regulation of workers' compensation under the MOU.  That was something they voluntarily have done.  They're just stepping in the shoes as an agent of the federal contractors.  That doesn't make it a federal governmental operation.  It's not a federal operation to do workers' compensation.  That's the federal contractors employees, and they've just voluntarily taken on.  The only thing they can -- because it's --

THE COURT:  The way I understand the argument is that the government didn't have to be there, necessarily, as the employer; the federal government didn't have to create the issue of a constitutional violation by being the federal employer. They could have just stayed away.  The state could have done this anyway.  There would have been no problem.  But by

volunteering to come on the scene and say, "treat us as the employer"; oh, but wait a minute, that would be a constitutional violation, they've created this situation themselves.  So it's not really even a waiver situation.  It's that they're here voluntarily.  You're treating state workers as you would anywhere else in the state, and the federal government kind of stumbled into this mess on its own.

Is that kind of the argument you're making?

MS. SANDSTROM:  Basically.  I mean, they've -- they've -- the federal contractors have the obligation for workers' compensation coverage.  We don't regulate the federal government.  There's cases that say we can't get workers' compensation premiums from the federal government.  That's case law.

THE COURT:  Right.  They do that on their own for their own workers.

MS. SANDSTROM:  Right.  Right.  So we don't do that. They've just voluntarily decided to take this on, for reasons of their own.  But that's not something the state has created. That's something that they've chosen to do.

THE COURT:  Okay.  I think I understand your argument.

MS. SANDSTROM:  The -- there's a mention of other statutes that are waivers that address intergovernmental immunity and provide waivers in certain circumstances.  And what's really striking about those statutes that are discussed

in the Department's motion for summary judgment is they don't have the "as if" they were on the premises exclusively in the state's jurisdiction.  And so I think that we have to understand that Congress had special intent when they used that language to mean something, and it doesn't mean that you have to treat everyone the same.  The state is not required to treat individuals in its own state the same, as long as it has a rational basis or isn't for an impermissible motive, such as discrimination or something like -- or ethnicity or sex or something like that.  But provided it's not that and assessed by category, you can have differential treatment based on the hazards.

THE COURT:  As long as the state has a rational basis, and that's how the state is using the rational basis argument, as long as the state has one, it can treat different workers differently under its L&I system; that's the State's position.

MS. SANDSTROM:  That's the State's position.

Now, I did want to answer a question you asked counsel about whether there was an issue of material fact, and I don't think there is.

THE COURT:  I was going to get there.

MS. SANDSTROM:  I don't believe there is, I would agree. And I would note it's the nature of what's going on here, it's rational basis analysis, as intergovernmental immunity is out. And under rational basis, there's no fact-finding.  The

Department cites a case, *Armor*.  The U.S. Supreme Court says that you don't engage in fact-finding.  You can engage in rational speculation.

THE COURT:  You don't have to talk me out of fact-finding.  If both agree I don't need to do it, that's fine. I just wanted to make sure what your position was.

But if you're saying there has to be a rational basis for treating different -- different workers differently, what is the rational basis for treating the third-party contractors at the Hanford site differently than that state inspector?

MS. SANDSTROM:  Well, there is -- it's two-sided.  First, the federal government would have to show -- and its their burden to disprove this -- that -- that the state health workers were the problem, that they were the ones getting sick, that they had the exposure time, that that's -- that that's the issue.  So they have to show that on their side.

But the -- the legislature can concern -- can be construed to be rational because it first is considering the nature of the employer.  The federal contractors are the employer here, and they're the ones that have the bad track record, and they're the ones that have done things like know about dangerous radioactive materials and not done anything about it until there's a release just last week.  So they're the problem, and they are the ones with the lack of monitoring, historically lack of personal protection equipment.

So the legislature could rationally decide to address that as the problem, and then maybe as the next step, in the incrementalism that is permissible under rational basis, address a different problem about a DOE -- or a DOH inspector at a later time.  Because you can address problems step by step under rational basis.  You don't have to solve the whole problem all at once.  And that's the reason why.

But there's good reasons why the legislature focused its energy, because they were cognizant of the fact that we had the federal contractors with the poor record and the problem with those employees presenting with all sorts of conditions that then they can't prove what had happened and the difficulties with them with medical proof.

THE COURT:  Was the poor recordkeeping the driver behind the -- this new law?

MS. SANDSTROM:  I think we have to assume that the legislature was aware of it.  There's that tank -- the TVAT report -- now I can't remember what the acronym stands for, but that report that happened in 2014, and in that report it talked about the lack of monitoring of -- of the safety -- so we have to assume that the legislature was aware of that.

There was also, in 2017, a plutonium release that was airborne.  It got as far as Richland.  It was on workers' cars.  And that's the sort of rational speculation information you can consider.  And so they say, well, it's not just affecting

cleanup workers, it's affecting office workers.  Well, you know, those office workers were there for that -- for that release, so that's something the legislature would have been aware.

And, also, the Department has presented evidence from its toxicologist that office workers get conditions, come down with problems when they're on site.  It's not just exclusively health problems limited to those doing cleanup operations.  So it was rational for the legislature to think this is a dangerous area with dangerous cleanup operations.  The nature of toxic waste and the nature of radioactive waste is that it can affect other people.

THE COURT:  Okay.

MS. SANDSTROM:  If there's no more questions, the State of Washington would ask this Court to grant summary judgment in favor of the State.

THE COURT:  Okay.

Mr. Healy, I'll give you just a few moments, and I'll do the same for Ms. Sandstrom as well.

MR. HEALY:  First off, Your Honor, I'd just like to note that the United States and the Department of Energy have the utmost respect for people who work in dangerous positions at Hanford, and share the goal of making sure that those who are injured as a result of some injury at Hanford are expeditious compensated.

THE COURT:  I never doubted that for a minute.

MR. HEALY:  Thank you, Your Honor.

A couple of points.  First, the State mentions the *Lewis* case, which I'd like to read a portion from the *Lewis* case.  Pardon me.  I covered it up.

The *Lewis* case does not actually support the State's position, Your Honor.  In that case, Lewis County had applied property taxes, including interest and penalties, on federally held land.  There was a waiver provision that allowed the state to tax federal land, quote, in the same manner and to the same extent as other property is taxed.  The United States in that case took the position that other property was other -- other property publicly held property.

So the Court actually held that the county could tax the land, given the fact that private entities in the state were also subject to the state law.  So this is a state tax that had applied non-discriminatorily across the state, and for that reason the state could -- could apply this tax with respect to federally held land.  But the Court in that case disallowed interest and penalties since there was no clear waiver of intergovernmental immunity under that -- under that phrase, under that waiver phrase.

The Court said -- this is the Ninth Circuit -- (reading): The difficulty with the county's approach is that even though Congress could have entertained that intent, it did not express it unequivocally.  The requirement that federally held property

be subject to taxation in the same manner as other property can refer to the time when taxes due, the matter of valuation, or any number of other elements of the state taxing process, other than the imposition of interest, penalties, and foreclosure. This plausible interpretation is sufficient to render the meaning of the phase "in the same manner" ambiguous and prelude us from accepting it as an unequivocal waiver of immunity from interest, penalties, and foreclosure.

So that case actually was one in which they looked at the waiver provision, said sure, it applies with respect -- it applies with respect to this nondiscriminatory tax, but it does not apply with respect to these more heightened factors that apply to the federal government.

Secondly, I'd like to point out the fact that the law, if you take a look at it and read through it, it doesn't point out any specific hazards or any specific type of employment except employment that is done for the United States --

THE COURT:  Does it have to?

MR. HEALY:  I believe that it does, Your Honor.  I think that if the state wants to treat this law as if it was the same as one of the other laws they've mentioned, the firefighter presumption or some other law, I think it would have to do that, and it doesn't here.

THE COURT:  Well, why does the state have to state reasons?  I mean, you've already argued the rational basis test

doesn't apply here and the balancing test doesn't the apply here.

Can't the state just pass a law that thou shalt not drive under the influence?  It doesn't have to have reasons in that statute as to why we shouldn't do that.  I mean, does it have to have its reasons in the actual statute?

MR. HEALY:  I think that what Your Honor should take -- should actually examine with respect to this is what is the law actually doing.  So I think you're right, that the reasoning behind the statute is not the inquiry that this Court actually should undertake.  The inquiry is what does this law actually do.

And so as Your Honor mentioned previously, the phrase, you know, work directly, indirectly -- or indirectly for the United States, if this just said, you know, works at the Hanford facility and doesn't mention the United States, I don't think that changes the nature of what the law actually does.  So I don't think that actually would save the State's position.

The State mentioned special interest with respect to the -- that Congress had some special interest with respect to the "as if" phrase in the waiver statute.  I'd just like to reiterate the fact that they've described no reason why Congress might have had some special interest to make -- in -- in modifying this language.  And, in fact, every single one of the statutes that they mention does this waiver in a slightly

different way, but it's getting at the same problem, which is we need to create a backstop here to make sure that states aren't treating the federal government in some extreme way that is not being treated in some other -- some other way across the state.

So I think the last thing I would -- I would like to point Your Honor's attention to, and I gave copies of this to opposing counsel, and this was -- this was filed along with the Jones declaration, if I may.

THE COURT:  You may.

MR. HEALY:  Thank you very much.

Along -- which is at 20-2.  These are maps of the Hanford site, and if you see in the middle, there's a small white box that's labeled "U.S. Ecology."  You'll see one of them is more detailed than -- than the other.  The less detailed one is the one that is the -- the effect of the law itself.  They are a map of the same area.

THE COURT:  I don't see "U.S. Ecology."  If you could hold it up and just put your finger there --

MR. HEALY:  Thank you very much.

THE COURT:  -- I could probably find it.

MR. HEALY:  So directly in the middle of the map, do you see "ERDF"?

THE COURT:  Yes.

MR. HEALY:  Directly to the right of it --

THE COURT:  Oh --

MR. HEALY:  -- you see --

THE COURT:  There it is.

MR. HEALY:  -- "U.S. Ecology" in the small --

THE COURT:  Yes.

MR. HEALY:  So that is a facility that directly abuts the covered areas.  The gray areas, ERDF and the 200 West area and 200 East area, are areas that are covered under the HB1723 presumption.  U.S. Ecology site is a low-level radioactive waste disposal facility that is right in that same area, is directly there, and there are -- there are workers there who dispose of radioactive waste, and there are workers there who work in offices in the same way that there are workers who are working in these -- these areas directly next to them.

And so if the state's position is that an office worker working at ERDF, let's say, may be exposed to some chemical working in an office in a way that is different from a worker working in this courthouse, Your Honor, then they've shown no reason why they would treat U.S. Ecology differently simply because that is -- because that is land that is leased to a private entity.

So that's yet another example of the discrimination here.

And a final example I'd like to point out is the fact that there is -- there's a facility that treats radioactive waste that comes from Hanford called Perma-Fix, which is off of the Hanford site, and it is not treated under 1723.  The

individuals who are federal contractors who work at Hanford and actually take that waste from Hanford and put it on a truck and send it to the Perma-Fix facility, those workers receive the presumption, but the workers who actually take that nuclear waste off of the truck once it gets to the Perma-Fix facility, even though it is the exact same waste, are not treated -- do not receive the presumption under 1723.  So it is yet another example of ways in which this law discriminates against the federal government, and without any rational basis, let alone a -- a -- the heightened standard that -- that the United States is -- position is that would be required under the *Davis* case.

The State mentioned that they believe that the government is the problem here, that government recordkeeping was the problem.  I'd like to push back on that.  I think that the whole point of workers' compensation here, it needs to be understood in context.  The point of workers' compensation is to get workers back in a position where they can actually re-enter the work force.  That's the whole point of workers' compensation. It is not a mode of punishment.  It is not a mode of tort -- you know, a rationale for tort recovery.  And I think that the state has just wildly overstepped in this particular instance. Although, it may have had good reasons for passing a law like this, it's just simply overbroad, and does so in a -- in a way that is not -- is not reasonable, let alone sufficiently justified.

Moreover, in the State's filings, they've attached the house bill report in their ECF No. 28-1.  This is the legislative record, basically the entirety of the legislative record behind this bill.  It's very sparse.  It's only a couple of pages, and it doesn't include any -- any mention of lack of monitoring; these kinds -- these kinds of issues.

I think that with respect to this state legislature, I understand what they were trying to do.  They just didn't actually -- you know, actually work through the issues that this law would present.

THE COURT:  Well, that's -- you know, I've practiced or been a judge in the state of Washington for almost 40 years, and that's just sort of the nature of the game.  The state legislature here just doesn't create the same type of legislative record that you see out of Congress.

But that's not really the point, is it?  I mean, whether they created an extensive record as to their deliberative process or not, the question is does the law itself violate the Supremacy Clause.

MR. HEALY:  I agree with you, Your Honor.  I think that's -- I think that's exactly right.  I think that, you know, there are certainly things that the Court -- that the legislature may have considered.  But I think if you look at what the law actually does -- did, I think that -- that it's clear that the law discriminates against the federal government

and its contractors impermissibly.

And with that, Your Honor, I'd like to just finally read one small bit from the -- from the *Boeing* case from the Ninth Circuit with respect to the point that the uniquely contaminated nature of the site doesn't play into the analysis.

The Court said, (reading):  SB990 also violates the intergovernmental immunity because it discriminates against the federal government and Boeing as a federal contractor.  A state law -- a state or local law discriminates against the federal government if it treats someone else better than it treats the government.

That's a quote from the *City of Arcata* case, also from the Ninth Circuit.

(Reading):  California does not dispute that SB990 singles out Boeing, DOE, NASA, and the Santa Susana Field Laboratory site -- that was the site in that case -- for a substantially more stringent cleanup scheme than that which applies elsewhere in the state.  The fact that Santa Susana is especially contaminated does not render the law nondiscriminatory because California's generally applicable environmental laws do not impose SB990 radioactive cleanup standards at the Santa Susana site.  By doing so -- this is later on -- by doing so, SB990 discriminates against the federal government and against Boeing as a federal contractor.  Therefore, it is invalid under the doctrine of intergovernmental

immunity.

This is binding on this Court, Your Honor, and I think that case answers the question.

THE COURT:  Okay.  Thank you.

MR. HEALY:  Thank you very much.

THE COURT:  Thank you.

Did you want your charts back?

MR. HEALY:  You can keep them, if you'd like.

THE COURT:  Thank you.

Ms. Sandstrom?

MS. SANDSTROM:  Yes, Your Honor.

Counsel attempts to distinguish *Lewis* because it had a portion of it with respect to penalties that weren't -- intergovernmental immunity wasn't waived.  But if you look at the *Lewis* case, there's another portion of the decision that addressed the taxation statute itself, and they did tax the federal government, but they didn't tax the state and county, and the Ninth Circuit said that that was okay.  So that case directly applies.

But we don't -- we don't even have to look to *Lewis*.  We can look to *Goodyear,* and the Supreme Court said that even if there's direct regulation, that's all right.  So the Supreme Court is saying, in the *Goodyear* case, there's a waiver of intergovernmental immunity analysis, so we don't look at direct regulation; we don't look at discrimination, the tests that

they're citing from the *Boeing* case.

In *Boeing*, the Court in that case said that the -- the waiver statute didn't apply; that it hadn't been met.  So there wasn't a waiver of intergovernmental immunity in *Boeing*, so of course you do the two-part test with respect to direct regulation or discrimination.

But here we don't do the two-part test.  Even if you did it, we'd be -- the statute is permissible, but we don't need to do that test because there's been a waiver of intergovernmental immunity.  That's the whole point of the intergovernmental immunity statute.  So if 3172 applies, which it does because you have to look at a project as if it were under the exclusive jurisdiction of the state, if you could legislate the same type of law under the exclusive jurisdiction of the state, it's permissible, and that's where you look; so take the federal government out of the equation and look to see whether the law would be permissible.

And the fact that there's federal contractors involved in this situation is of no surprise.  The whole statute itself deals with federal contractors.  Of course they're going to be involved.  Of course the United States is going to be involved.  The whole statute is about federal contractors, so they're going to be -- it's permissible to regulate them under -- if there's a waiver of intergovernmental immunity, which there is.

So then we get to the rational basis.  And I hear them

making arguments that it's not rational basis.  But they're ignoring the fundamental test of rational basis is if it advances a legitimate government interest, and it does.

And I want to cite the *Ledezma vs. Sessions* case.  This is not in the Department's brief.  It's at 857 F.3d 1042.  And what this case stands for is the principle that a legislature can do one problem at a time.

So they've pointed to some hazards that the U.S. Ecology employees would be subject to.  And maybe that's true.  But the legislature can decide to address those problems at a later date if they, in fact, have the same problems.  They're dealing with low-level waste there.  They're not doing the kind of work that's done on the cleanup site, with the kind of hazards that are on the cleanup site.  So the legislature could very well think that the cleanup site was where the problem is, and low-level hazardous waste that is not being processed with the same employers.

And I want to say that the State of Washington is not saying that the federal government doesn't care about workers.  We're not even saying that the federal government is the inquiry here.  This is a statute addressed to federal contractors.  It's the federal contractors that have the track record of poor monitoring of the workers.  It's the federal contractors that didn't give personal protective equipment to their workers.  That's -- that's the problem, and that's who's regulated by the

statute.  The state is not regulating the federal government. So the focus is on the federal contractors with the poor track record.  And it's permissible under rational basis to consider that.

And as Your Honor noted, that legislative history in Washington is very sparse, but under the rational speculation that the *Armor* case the U.S. Supreme Court said is permissible, the Court can speculate as to the reasons why the legislature would have adopted it, and the federal -- or the federal government would have to disprove that conclusively, which they cannot do.

So there are many reasons why the legislature did the -- the bill why it did.  But I would note we're not -- the state's not in this for the money.  These premiums and self-insured money are used to treat injured workers who have medical conditions that were caused by their employment.  I mean, that's -- when you get workers' compensation, there's a presumption now, but that's rebuttable.  The firefighter presumption, there's one there; it's rebuttable.  There's no constitutional right to have the burden of proof on the worker, certainly.  That can be done on the employer.  That's just a legislative decision of the type of legislative decisions that are upheld under rational basis analysis time after time again.

I think what it boils down to is what the federal government is saying, it doesn't -- if the federal government

has a problem on land for its federal contractors, the state can't take action to solve that hazard.  That's what their argument boils down to.

And that is not Congress' intent.  Congress intended to have workers' compensation coverage for the workers who had -- who suffer the conditions caused by their employment.  That's in the legislative history that we provided with our briefing.  That's in the case law; *Travelers Insurance*, *Capitola*.  The case law says that the federal government wants -- the Congress wants workers to be -- to have workers' compensation coverage that addresses their needs.

Well, here their needs are heightened because the specific hazards at Hanford.  And just like the legislature has taken steps to address other kinds of hazards that were approved of in the *Mountain Timber Company* by the United States Supreme Court, that have been dealt with firefighters, the state of Washington is addressing the medical needs of these very vulnerable citizens, and they may do so because Congress intends for a waiver of intergovernmental immunity.

We ask that this Court grant summary judgment to the State of Washington.

THE COURT:  Okay.  Thank you, Ms. Sandstrom and Mr. Healy.  I appreciate the briefing that was done by both parties and the argument that was presented by both parties.  It was helpful to the Court in both respects.

I'm going to close the record.  I'm going to take this matter under advisement.  I do think both parties make some good arguments that I just want to sort through one more time.  Pardon me.  I did it before the hearing, and -- but you both made some good points, and I just want to kind of work through the issue one more time.  It shouldn't take too long, but I'm going to take it under advisement.

And I have -- both of you are in agreement that one way or the other, this ends the case.  There's no need for fact-finding.  There's no material issue of fact at issue.  This is purely a legal issue, and the Court can resolve this case with a ruling granting the motion for one party or the other.

So with that, I'll do that as quickly as I can, but I would expect, the Court's calendar and other cases before it, a three-day holiday, maybe up to two weeks.  Maybe sooner than that, but ...

All right.  Anything else?

MS. SANDSTROM:  Nothing from the State.

THE COURT:  All right.  Mr. Healy?

MR. HEALY:  Nothing from the United States, Your Honor.

THE COURT:  All right.  Did you travel from Washington, D.C., out here?

MR. HEALY:  Yes, we did.

THE COURT:  Going home tonight or --

MR. HEALY:  Tomorrow morning.

*USA v. Washington State Dept. Of Labor and Industries/4:18-CV-05189-SAB* 59
*Motion Hearing/May 22, 2019*

THE COURT:  All right.  Well, thank you for coming out. I hope you enjoyed your visit, and wish you safe travels, and to you as well, on your way home.  Thank you.

THE COURTROOM DEPUTY:  Please rise.

Court is in recess.

(Hearing concluded at 2:50 p.m.)

60

C E R T I F I C A T E

I, KIMBERLY J. ALLEN, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Richland, Washington;

That the foregoing proceedings were taken on the date and at the time and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings.

DATED this 5th day of June, 2019.


_____

Kimberly J. Allen, CRR, RMR, RPR, CCR(WA)
Washington CCR No. 2758
Official Court Reporter
Richland, Washington